UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**Apex Technology Sales, Inc.,**
**a Minnesota corporation,**

               **Plaintiff,**

   v.

**Leviton Manufacturing, Inc.,**
**a Delaware corporation**

              **Defendant.**

Civil No. 17-2019 SRN/HB

<u>**MEMORANDUM OPINION**</u>
<u>**AND ORDER**</u>

---

J. Michael Dady, John D. Holland, and Serena I. Chiquoine, Dady & Gardner, P.A., 5100 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402, counsel for Plaintiff.

Bradley J. Lindeman and Jennifer Zwilling, Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4400, Minneapolis, Minnesota 55402, counsel for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

    Before the Court is the Motion for a Temporary Restraining Order [Doc. No. 4] filed by Plaintiff Apex Technology Sales, Inc. ("Apex"). Because Defendant Leviton Manufacturing, Inc. ("Leviton") received notice and the Motion has been fully briefed, the Court will treat it as a Motion for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a). The hearing on the motion was held on June 19, 2017. For the reasons set forth herein, the preliminary injunction is granted.

**I.   BACKGROUND**

Plaintiff Apex is a Minnesota corporation with its principal place of business in Minnesota. (Compl. [Doc. No. 1] ¶¶ 6-7.) Defendant Leviton is a company incorporated in Delaware, with its principal place of business in New York. (Id. ¶¶ 8-9.) Leviton "researches, develops, manufactures, and distributes electrical wiring devices, network and data center connectivity solutions, LED lighting and lighting energy management systems, and security and automation applications." (Leland Decl. ¶ 3 [Doc. No. 11].) To conduct its business, Leviton utilizes an independent sales force. (Id. ¶ 5.) Since July 1998, when Apex and Leviton first entered into a written agreement, Apex has served as Leviton's exclusive sales representative for the designated territory of Minnesota, North Dakota, South Dakota, and Western Wisconsin. (Compl., Ex. A (1998 Agmt.).) In exchange for servicing this sales territory, Leviton agreed to pay Apex commissions on its sales, as set forth in Appendix A of the 1998 Agreement. (Id., Ex. A ¶ 2.1.) The caption for Appendix A indicated that commission rates would be revised annually. (Id., Ex. A, App. A.)

In September 2002, the parties entered into a new agreement through which Apex again agreed to serve as Leviton's exclusive sales representative for the sale of products identified in Schedule A of the contract, in the territory identified in Schedule B. (Compl., Ex. B ¶ 1 (2002 Agmt.).) The amount of compensation was set forth in Schedule C, (id., Ex. B ¶ 4), which was similar to Appendix A to the 1998 Agreement. Although Schedule C did not expressly state that commission rates would be revised

annually, nearly every year from 2002 onward, Leviton provided an amended commission schedule, effective from January 1 through December 31 of a given year, which Apex signed and returned to Leviton. (Compl. ¶¶ 22, 24.) The annual amendments altered the commission percentages and also changed the products to which the commissions applied. (Id. ¶ 25.) For example, while the 2002 Agreement states, "Certain national accounts, house accounts, OEM accounts and/or direct end users will NOT be included in commissionable sales," (Compl., Ex. B ¶ 4(e)), the 2015 Commission Schedule C states, "Certain national accounts, OEM accounts, and end users may not be included in commissionable sales at Leviton's discretion." (Id., Ex. C, note 2) (emphasis added). Also, while the 2002 Agreement provides that commissions will be based on the "final net invoice price for the product," (id., Ex. B ¶ 4©), the 2015 Commission Schedule states, "commissions are paid on net sales." (Id., Ex. C, note 6.) The 2015 Commission Schedule further includes certain commission terms regarding "Copper and Fiber Products" and "Residential (CH) Products," (id.), neither of which appeared in the 2002 Agreement.

Among its other terms, the 2002 Agreement also provides for termination without cause upon 30 days notice and termination for cause upon five days notice. (Compl., Ex. B. ¶ 10.) In addition, the 2002 Agreement states that it is to be construed and enforced according to the laws of New York. (Id. ¶ 13.)

When Leviton transmitted its commission changes to Apex in the 2015 Schedule C, it also included a document entitled "Expectations of a Rep Firm" ("Expectations

3

Document"). (Compl., Ex. D (2/12/15 Letter).) In its transmittal letter, Leviton noted that while the Expectations Document did not provide quotas or numbers, it was intended to serve as a statement of Leviton's expectations in order "to eliminate any misunderstandings" between Leviton and its sales representatives. (Id., Ex. D at 1.)

Apex alleges that during the course of its relationship with Leviton, it expended substantial time and energy creating and developing the Leviton market within its territory. (Compl. ¶ 34.) Further, Apex contends that Leviton never indicated that Apex's sales performance was unacceptable. (Id. ¶ 35.) To the contrary, Apex contends that Leviton presented numerous sales awards to Apex. (Id. ¶¶ 36-43.)

However, Bradford Leland, Leviton's Vice President of Sales, attests that in 2016, Leviton grew concerned with what it perceived to be a high turnover rate among Apex's sales representatives and employees. (Leland Decl. ¶ 14.) Leland contends that Leviton raised these concerns with Mike Pride, a principal and sales representative with Apex, on numerous occasions. (Id. ¶ 15.) In addition, Leland asserts, Leviton asked Apex to create an action plan to address these concerns. (Id. ¶ 16.)

Apex alleges that on April 30, 2017, Leviton's representative Jim Martin contacted Apex employees, informing them that Apex's future as a Leviton sales representative was uncertain, and making comments along the lines of "it was nice working with you." (Compl. ¶ 53.) In early May 2017, Apex contends, Martin began surreptitiously contacting Apex customers, encouraging them to bypass Apex altogether and to place their orders directly through Leviton. (Id. ¶ 54; Compl., Ex. G.) Apex's Michael Pride

4

asserts that in addition to one of its best customers, Parsons Technologies, three other Apex customers have informed him that they will now work directly with Jim Martin. (Pride Decl. ¶¶ 20, 22 [Doc. No. 13].)

At some point in May 2017, Mike Mursat, an Apex sales representative working on the Leviton account, resigned from Apex. (Leland Decl. ¶ 18; Compl., Ex. G (5/3/17 Email).) Leviton's Leland attests that Mursat's resignation prompted Leviton to send Apex a letter on May 12, 2017, announcing its termination of the parties' agreement, effective 30 days from Apex's receipt of the letter. (Leland Decl. ¶¶ 18-19; Compl., Ex. E.) Apex received the termination notice on May 15, 2017. (Compl. ¶ 50.) During the ensuing 30-day period, Apex contends that it attempted to persuade Leviton to withdraw the termination notice while still continuing to fully perform under the terms of the contract. (Id. ¶ 52.) Apex alleges that at the same time, however, Leviton failed to abide by the terms of the parties' contract. (Id.) For instance, Apex asserts that on or around May 15, 2017, Leviton terminated Apex's access to the Salesforce software program used by Leviton's sales representatives to document and update projects. (Id. ¶ 56.) Apex also asserts that for approximately a month and a half before Leviton issued the termination notice, Jim Martin visited Apex's territory directly, seeking no coordination with Apex, contrary to industry practice. (Pride Decl. ¶¶ 20, 23.)

Leviton, on the other hand, contends that it conducted normal business operations with Apex both before and after the issuance of the termination notice. (Leland Decl. ¶ 21.) It asserts that its standard practice is to deny Salesforce access to sales

5

representatives in these circumstances and it instructed Apex to directly report the Salesforce information to Martin. (Id. ¶ 24; Leland Decl., Ex. 2 (5/15/17 Email).) In addition, Leviton contends that it did not interfere with customers in Apex's territory, (Leland Decl. ¶¶ 22-23), and it continued to pay Apex commissions during the 30-day period. (Id. ¶ 25.)

It appears that on May 18, 2017, Apex responded to Leviton's termination letter, asserting its position that termination was improper under the Minnesota Termination of Sales Representatives Act ("MTSRA"), Minn. Stat. § 325E.37. (See Leland Decl., Ex. 3 at 1 (5/26/17 Letter) (referencing content of Plaintiff's 5/18/15 letter).) In response, on May 26, 2017, Leviton expressed its disagreement with Apex's recitation of the facts and of the application of the MTSRA to the parties' 2002 Agreement. (Id. at 1-2.) Leviton further stated in the May 26 letter, that even if the MTSRA applies, it alternatively provided notice of non-renewal, pursuant to Minn. Stat. § 325E.37, subd. 3.[1] (Id. at 2.)

On June 13, 2017, Apex initiated this lawsuit, asserting the following claims against Leviton: (1) violation of the MTSRA (Compl. ¶¶ 59-72); (2) breach of contract and the implied covenant of good faith and fair dealing, (id. ¶¶ 73-80); and (3) tortious interference with contractual relations and prospective economic advantage, (id. ¶¶ 81-

---

[1] The Court recognizes that the parties dispute whether their 2002 Agreement was a contract of indefinite duration and therefore whether Leviton could elect not to renew it within a 180-day period under Minn. Stat. § 325E.37, subd. 3. At this point, the Court need not determine whether Leviton can elect not to renew the contract, as it is outside the scope of the instant motion.

83). It also filed the instant motion for preliminary injunctive relief in which it asks the Court to: 1) enjoin Leviton from terminating the 2002 Agreement, as amended and that the parties continue operations pursuant to the obligations set forth in the contract; 2) to permit Apex the use of software used in operating as a Leviton sales representative; and 3) to enjoin Leviton from taking certain actions or making certain statements to its customers. (Proposed Order at 1 [Doc. No. 9].)

## II.    DISCUSSION

This Court must consider four factors to determine whether preliminary injunctive relief is warranted:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest.  Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*); accord Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase).  To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).  A preliminary injunction "is an extraordinary remedy never awarded as a matter of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 376 (2008).  The burden of establishing the four Dataphase factors lies with the party seeking injunctive relief.  Watkins, 346 F.3d at 844.

A.     **Likelihood of Success**

In order to obtain a preliminary injunction, Apex must show that it has a "fair chance of prevailing" on its claims. Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008). "An injunction cannot issue if there is no chance on the merits." Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005). However, the question is not whether the movant has "prove[d] a greater than fifty percent likelihood that [it] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," Watkins, 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." PCTV Gold, 508 F.3d at 1143. Because Plaintiff focuses on its claim under the MTSRA, the Court begins its analysis with this claim.

1.     **MTSRA**

As this Court has observed, the purpose of the MTSRA "is to afford some protection to sales representatives by limiting the circumstances under which their agreements may be terminated." Cooperman v. R.G. Barry Corp., No. 4-91-633, 1992 WL 699500, at *8 (D. Minn. Jan. 10, 1992). The MTSRA provides the following protections to sales representatives facing the termination of an agreement:

> Subd. 2. Termination of agreement. (a) A manufacturer, wholesaler, assembler, or importer may not terminate a sales representative agreement <u>unless the person has good cause</u> and:
>
> (1) that person has given written notice setting forth the reason(s) for the

>   termination at least 90 days in advance of termination; and
>
>   (2) the recipient of the notice fails to correct the reasons stated for termination in the notice within 60 days of receipt of the notice.

Minn. Stat. § 325E.37 (2017) (emphasis added). And, to the extent that sales representative agreements contain choice-of-law language calling for the application of the laws of other states, the MTSRA, as amended in 2014, contains an "anti-waiver" provision, making such choice-of-law provisions void and unenforceable. Minn. Stat. § 325E.37, subd. 7(a)(1)-(b) (2014). Instead, manufacturers, wholesalers, assemblers, or importers are required to comply with the MTSRA, regardless of choice-of-law provisions. Id., subd. 7(b). The 2014 amendments became effective on August 1, 2014 as to "sales representative agreements entered into, renewed or amended on or after that date." See MN LEGIS 165 (2014), 2014 Minn. Sess. Law Serv. Ch. 165 (S.F. 2108).

Here, however, the 2002 Agreement provides for 30 days notice of termination without cause, does not require either party to identify the reasons for termination, nor does it give the terminated party an opportunity to rectify any of the stated reasons for termination. (See 2002 Agreement ¶ 10.) Further, it calls for the application of New York law. (Id. ¶ 13.) But if, as Plaintiff asserts, the parties' agreement was amended after the August 1, 2014 effective date of Minn. Stat. § 325E.37, the MTSRA would apply, giving Apex greater protections than under the terms of the 2002 Agreement. This would include a longer notice period and an opportunity to cure any identified deficiencies in performance. Thus, in evaluating the likelihood of success on the merits of Plaintiff's

9

MTSRA claim, the Court must consider the likelihood of success of Plaintiff's allegation that the 2002 Agreement was amended in 2015 through the offer and acceptance of the 2015 Schedule C and/or the Expectations Document.

The 2015 Schedule C indicates that it "replaces all other schedules and is valid from January 1, 2015 to December 31, 2015." (Comp., Ex. C.) It lists Leviton products by class name, content description, type, and provides six different commission rates for various types of products. (Id.) Leviton argues that modification of a contract generally involves the negotiation of modified terms, which did not occur with respect to the 2015 Schedule C. (Def.'s Opp'n Mem. at 13 [Doc. No. 10].)

In Cooperman, this Court also considered whether a change in the MTSRA applied to the parties' sales representative agreement.[2] 1992 WL 699500, at *4. The plaintiffs asserted that their termination lacked good cause and the requisite amount of notice under the MTSRA. Id. But the defendant argued that the parties' agreement pre-dated the effective date of the statutory provisions in question, making those provisions inapplicable, id., just as Leviton argues that the 2002 Agreement predates the August 1,

---

[2] Although the Cooperman opinion variously refers to Minn. Stat. §§ 325E.27, 325E.37, and 325E.67 when discussing the MTSRA, the references to §§ 325E.27 and 325E.67 appear to be typographical errors. See, e.g., Cooperman, 1992 WL 699500, at *6-8. Elsewhere in the opinion, the Court makes clear that the plaintiff's claim was brought under § 325E.37, and repeatedly cites the statute. Id. at *1, 4-5. Moreover, § 325E.67 does not appear to have existed as a statute at the time of the Cooperman decision, nor does it exist now, and § 325E.27, in effect in 1987 and currently in effect, applies to the use of prerecorded or synthesized voice messages. It is therefore inapplicable to the Cooperman case, which concerns sales representatives' commissions.

2014 effective date of Subdivision 7. Citing legislative language, this Court noted in Cooperman that the applicable statutory provisions applied to agreements entered into or renewed on or after the date on which the statute took effect, i.e., August 1, 1990, and August 1, 1991, as to certain amendments. Id. at *5 (emphasis added). The plaintiffs argued that the MTSRA's protections applied because by changing commission rates after the statute's effective date, the parties materially changed the agreement, making it subject to the statutory amendments. Id. The defendant countered that the changes merely modified the existing agreement such that the MTSRA was inapplicable. Id.

The Court observed that under Minnesota contract law, "the modification of a contract 'results ordinarily in a new contract consisting of the old terms insofar as they remain unchanged and of the new terms and conditions introduced by the modification.'" Id. (quoting 8 Dunnell Minn. Digest, Contracts § 9 (4th ed. 1990)). In finding that a modification had occurred and the MTSRA was likely applicable, the Court provided two reasons in support of its decision:

> First, the renegotiation and modification involved the price, a material term of the contract. Second, the statute was enacted to protect the rights of sales representatives; to interpret it so narrowly as to exclude from coverage agreements that were renegotiated after the statute's effective date would frustrate that intent.

Id.

Applying Cooperman to the facts presently before the Court, the information contained in the 2015 Schedule C involves precisely the same material term: the price, as modified in 2015, that Leviton offered to pay Apex for its services, which Apex accepted,

11

for the products that Apex agreed to sell. The price to be paid is perhaps the most central term of the agreement. Leviton had the right to alter commission rates and products, just as Apex had the right to refuse to accept those rights and attempt to renegotiate. The Court agrees with Plaintiff that by altering the fundamental rate of compensation and adding new products in 2015, Apex gave consideration for the modification. Also, the policy considerations articulated in Cooperman of furthering the Legislature's intent to afford a measure of protection to sales representatives likewise apply here. The Court therefore finds it likely that Plaintiff will establish that the 2015 Schedule C amended the 2002 Agreement, rendering the MTSRA applicable to the amended contract. Because the Court finds that the 2015 Schedule C in fact amended the 2002 Agreement, the Court need not consider whether the Expectations Document amended that Agreement.

Also, because the 2015 Schedule C amendment occurred after the August 1, 2014 effective date of Subdivision 7, the non-waiver provision of Subdivision 7 applies. See MN LEGIS 165 (2014), 2014 Minn. Sess. Law Serv. Ch. 165 (S.F. 2108) (stating that the amendment applies to sales representative agreements entered into, renewed or amended on or after August 1, 2014). Subdivision 7 renders null and void the New York choice-of-law provision in the 2002 Agreement, and requires the parties to conform to the requirements of the MTSRA. Minn. Stat. § 325E.27, subd. 7(b). These requirements include a 90-day notice period for good-cause termination and a 60-day opportunity for the terminated party to cure any deficiencies. Id., subd. 2(1)-(2).

The statute defines "good cause" as

> a material breach of one or more provisions of a written sales representative agreement governing the relationship with the manufacturer, wholesaler, assembler, or importer, or in absence of a written agreement, failure by the sales representative to substantially comply with the material and reasonable requirements imposed by the manufacturer, wholesaler, assembler, or importer.

Id., subd. 1(b). While Leviton has submitted evidence that it was unhappy with the turnover rate of Apex's sales representatives, (see Leland Decl. ¶¶ 15-17), it did not identify any reason for termination in its notice to Apex. (See Compl., Ex. E (Termination Notice).) Rather, under the terms of the 2002 Agreement, Apex was terminated without cause, since Leviton provided 30 days notice, as opposed to five days notice for cause as contemplated in Paragraph 10. (See Compl., Ex. B, ¶ 10.) There is no evidence suggesting that Apex was given an opportunity to cure any deficiencies, as none were identified in Leviton's termination letter. While this case is in its early stages, the Court finds that because Plaintiff has sufficiently demonstrated that its claim under the MTSRA provides a "fair ground for litigation," Watkins, 346 F.3d at 844, the likelihood of success on the merits is satisfied.

### B. Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (per curiam) (quoting Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 506–07 (1959)). If monetary damages can compensate the plaintiff for the threatened harm, an adequate remedy at law exists, precluding injunctive relief. See

Northland Ins. Cos. v. Blaylock, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000) (citing In re Travel Agency Com'n Antitrust Litig., 898 F. Supp. 685, 689 (D. Minn. 1995)). The availability of monetary relief to compensate a portion of the harm does not preclude injunctive relief as to "other less tangible injuries [that] cannot be so easily valued or compensated." Glenwood Bridge, Inc. v. Minneapolis, 940 F.2d 367, 371-72 (8th Cir. 1991). Accordingly, "the availability of money damages that do not fully compensate the movant do not preclude a preliminary injunction." Id. The MTSRA contemplates monetary relief for the payment of all commissions, Minn. Stat. § 325E.37, subd. 4, as well as injunctive relief in the form of reinstatement of the sales representative agreement. Id. § 325E.37, subd. 5(b)(2).

Leviton argues that Apex has failed to demonstrate that monetary damages are inadequate to redress its harms and that Apex's relationships with other manufacturers are unaffected by the termination of the Leviton-Apex agreement. (Def.'s Opp'n Mem. at 8-11.) But Plaintiff asserts that given the prominence of Leviton in its line of business, the termination will diminish its goodwill and business relationships with other customers and its own employees. (Pl.'s Mem. Supp. Mot. for Injunctive Relief at 13 [Doc. No. 5].) Injury to goodwill may serve as the type of injury that constitutes irreparable harm for purposes of the issuance of injunctive relief. See Medtronic, Inc. v. Gibbons, 684 F.2d 565, 567 (8th Cir. 1982). The Court finds that Apex has adequately demonstrated irreparable harm, absent the issuance of injunctive relief, as to a portion of its alleged harm. Granted, any possible commission losses can be remedied through monetary

14

damages, but Plaintiff has presented evidence of the threat of irreparable harm to its relationships with its own employees and customers. (See Pride Decl. ¶¶ 14-15; 20-22.)

      C.     **Remaining Dataphase Factors**

The balance between the threat of irreparable harm to Apex absent injunctive relief and the injury to Leviton if injunctive relief is granted weighs in favor of Apex. Leviton asserts that reinstating the relationship after notice of termination and the filing of this suit will damage its business strategy. (Def.'s Opp'n Mem. at 15.) And, given the deterioration in the parties' relationship, Leviton questions Apex's commitment to provide proper service to Leviton customers. (Id.) But granting the requested injunctive relief merely continues the parties' relationship as it has functioned for many years. Leviton's argument is undercut by its alternative notice of non-renewal to Apex on May 26, 2017, which requires the continuation of the parties' relationship for a longer period of time than the 30-day period for which it initially served notice. Moreover, based on the parties' history dating back to 1998, as well as Apex's attainment of sales awards and feedback at quarterly sales performance meetings, the evidence suggests that Apex was performing to Leviton's satisfaction under the terms of the parties' agreement, with only relatively recent evidence of concerns about the turnover rate of Apex's employees. There is no evidence from which to assume that Apex will somehow sabotage its sales efforts with respect to the Leviton line of business, particularly as doing so might jeopardize its compliance with the parties' agreement. Therefore, the balance of harms weighs in favor of issuing the preliminary injunction.

As to the final <u>Dataphase</u> factor of the public interest, Plaintiff argues that granting its requested injunctive relief will serve the public interest by effectuating the legislative public policies set forth in the MTSRA of preventing the arbitrary termination of sales representatives. (Pl.'s Mem. Supp. Mot. Injunctive Relief at 14-15.) Defendant, however, asserts that public policy favors enforcing valid business agreements. (Def.'s Opp'n Mem. at 15-16.) The Court finds that this factor weighs in Apex's favor. Not only does the Court view the 2002 Agreement, as amended, as a valid business agreement, the agreement serves to enforce the public policies of the MTSRA.

In conclusion, because the application of the <u>Dataphase</u> factors weighs in Plaintiff's favor on its claim under the MTSRA, the Court need not apply the factors to the remaining two causes of action. Plaintiff's request for a preliminary injunction is granted.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiff's Motion for a Temporary Restraining Order, construed as a Motion for a Preliminary Injunction, [Doc. No. 4] is **GRANTED**;

2. Defendant Leviton Manufacturing, Inc. ("Leviton") is preliminarily enjoined from terminating the parties' 2002 Sales Representative Agreement, as amended, and the parties shall continue to operate pursuant to the obligations established thereunder;

3. Leviton shall allow Apex Technology Sales, Inc. ("Apex") to use Leviton software used by sales representatives to operate the Leviton sales

representative business;

4. Leviton shall not direct customers to bypass Apex as an authorized sales representative, or otherwise suggest that Apex is no longer an authorized sales representative; and

5. The posting of a security bond is not required.

Dated: June 26, 2017          s/Susan Richard Nelson
                                               SUSAN RICHARD NELSON
                                               United States District Judge